**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

Eastern District of Kentucky
**FILED**
DEC 27 2016
AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

THE UNITED STATES OF AMERICA; THE STATES OF CONNECTICUT, FLORIDA, IOWA, LOUISIANA, MARYLAND, NEVADA, NEW MEXICO, OKLAHOMA and TEXAS,

*ex rel.* JANE DOE,

Plaintiffs,

v.

PREFERRED CARE INC.; PREFERRED CARE, INC. *d/b/a* PREFERRED CARE OF DELAWARE, INC.; RELIANT PRO REHAB, LLC; RELIANT REHABILITATION HOLDINGS, INC.; PREFERRED CARE PARTNERS MANAGEMENT GROUP, LP; PCPMG, LLC; KENTUCKY PARTNERS MANAGEMENT, LLC; STANTON HEALTH FACILITIES, L.P. *d/b/a* STANTON HEALTH AND REHABILITATION CENTER; and THOMAS D. SCOTT,

Defendants.

CIVIL ACTION NO. 5:16-CV-478-JMH

***FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)***

**COMPLAINT**

---

## NATURE OF THE ACTION

1. This is an action brought on behalf of the United States of America by Plaintiff and Relator Jane Doe (hereinafter referred to as "Relator") against Defendants pursuant to the *qui tam* provisions of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33; and the

Connecticut False Claims Act, Connecticut General Statutes § 17b-301a, *et seq.*; the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*; the Iowa Medicaid False Claims Act, Iowa Code § 685, *et seq.*; the Louisiana False Claims Act/Medical Assistance Programs Integrity Law, 46 La. Rev. Stat. Ch. 3 § 437.1, *et seq.*; the Maryland False Health Claims Act, Md. Code Ann., Health-Gen § 2-601, *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010, *et seq.*; the New Mexico False Claims Act, N.M.S.A. § 27-14-1, *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. § 63-5053, *et seq.*; and the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001, *et seq.* (the "Named States").

2. The Relator in this case formerly worked at the Stanton Health and Rehabilitation Center ("Stanton"), a skilled nursing facility ("SNF") operated by Defendants in Stanton, Kentucky. The allegations of this Complaint result from the Relator's first-hand knowledge of Defendants' unlawful practices in knowingly falsifying numerous statements and claims submitted for reimbursement by government healthcare programs, including Medicare and Medicaid.

3. Defendants operate and provide services at more than 100 SNFs in twelve states and are responsible for the care of approximately 11,500 residents at any given time. Today, Defendants are the 12th largest provider of skilled nursing in the United States with income in excess of $750 million, most of which is paid by government healthcare programs.

4. As described in greater detail below, Defendants engaged in a scheme to defraud the United States and the Named States of millions of dollars of Medicare, TRICARE, and Medicaid funds each year in two distinct ways:

(i) by misrepresenting the medical condition of, and treatment provided to, residents at their SNFs, and thereby overbilling Medicare or TRICARE;

(ii) by submitting and causing others to submit inflated annual cost reports to the federal government and the Names States' governments, and thereby overbilling both Medicare and Medicaid.

5. This fraudulent scheme was encouraged by senior officers of Defendants, who established target reimbursement rates for each SNF and actively encouraged employees to falsify statements and claims submitted to the United States Centers for Medicare and Medicaid Services ("CMS"). Defendants also pressured and manipulated employees, such as Relator, who raised concerns about the fraud.

6. Defendants' fraud was principally committed through the Minimum Data Set Assessment ("MDS Assessment"), a report established by CMS that summarizes the medical condition and treatment provided to a particular resident at a SNF. Defendants were required regularly to submit MDS Assessments to CMS for each resident, and the information in those MDS Assessments formed the basis for reimbursement from Medicare. Defendants falsified MDS Assessments – thus making the resulting claims based on those MDS Assessments false – in several ways.

7. First, Defendants falsified MDS Assessments for residents covered by Medicare and by overstating residents' medical needs and the amount of care provided to them. Under the Medicare program, a SNF's reimbursement for a resident is based on the resident's classification in one of over 50 Resource Utilization Groups ("RUGs") as reported in the resident's MDS Assessment. The RUG level is determined based on information reported in the MDS Assessment and reflects the resident's need for (i) the amount of rehabilitative therapy (measured in minutes) provided to the resident, and (ii) nursing staff assistance to perform common Activities of Daily Living ("ADLs"), such as walking or using the toilet. To increase their

Medicare reimbursement rates, Defendants fraudulently inflated the RUG levels reported in MDS Assessments (and included in subsequent claims to CMS) by providing medically unnecessary rehabilitative therapy; by overstating the amount of rehabilitative therapy provided to residents; and by falsely representing that residents required extensive assistance for activities of daily living, when lesser levels or no such assistance was needed or provided.

8. Defendants also provided medically unnecessary therapy to Medicare residents to maximize Medicare billing during these residents' 100 days of Medicare coverage. After their Medicare benefits had been systematically exhausted by Defendants, these residents would fall into lower-paying Medicaid benefits, and Defendants then would cease to provide physical therapy to them, even though some therapy may have been medically necessary.

9. Defendants also provided inadequate funding and staffing at their facilities. Normally during the day, there should have been four nurses and eleven certified nurses' aides ("CNAs") to care for the 81 residents; and during the night, 2 nurses and 4 CNAs. However, on a typical day, only 2 or 3 nurses would be present and the facility was usually short by 5 or 6 CNAs. During the night, the facility was often down to just a single nurse and 2 or 3 CNAs. Stanton did not maintain a back-up schedule, known as a "PRN" list, in order to avoid the cost of having those nurses on paid standby. Frequently, this meant that office staff, albeit medically-trained office staff such as Relator, were pulled from their office jobs to work the floors.

10. This chronic understaffing resulted in atrocious resident neglect and avoidable deaths. Stanton was designated "DPNA" (Denial of Payment for New Admissions) on March, 21, 2014, and has paid more than $620,000 in fines over the last three years for substandard service. Even as their residents suffered (and sometimes died) from substandard care, Defendants reaped millions in profits each year from their cost-cutting efforts.

11. To avoid detection of this fraudulent scheme, and especially in cases where a resident died, Defendants would routinely create back-dated documents for residents many months after their admission. Defendants therefore sought through falsification of records to conceal their deviation from accepted standards of medical care and federal law.

12. Defendants' fraudulent scheme extended to more than 100 SNFs across the United States, resulted in the submission of thousands of false MDS Assessments and related claims to CMS, and generated millions of dollars of profits for Defendants each year. On behalf of the United States and the Named States, Relator brings this action to recover the funds unlawfully obtained by Defendants through their nationwide scheme to defraud.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over Relator's claims under the federal FCA pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. § 3732, and has jurisdiction over Relator's claims under the various state-law FCAs pursuant to 28 U.S.C. §§ 1367 and 31 U.S.C. 3732(b).

14. Venue is proper under 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because Defendants can be found, reside, and/or transact business in this judicial district, and because acts proscribed by 31 U.S.C. § 3729 have been committed by Defendants in this judicial district.

15. Relator's action is not based upon the disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, or from the news media. At the time this action was filed, there was no such disclosure, and in any event this action is based on Relator's direct and independent knowledge, not on any such disclosure. Furthermore, as discussed and demonstrated in this Complaint, Relator is an "original source" of the information

upon which this action is based: Relator has direct and independent knowledge of the information on which this action is based, and Relator voluntarily provided information about the claims asserted herein to the United States and the Named States before filing this Complaint. The fact that many thousands of claims presented to government healthcare programs (including Medicare and Medicaid) were inaccurate in the manner described in this Complaint is a material fact, which if known to the United States and/or the Named States would have caused them to deny paying those claims.

## THE PARTIES

16. Relator Jane Doe is a citizen of the United States of America and the Commonwealth of Kentucky, and is a Licensed Practical Nurse ("LPN") with more than 20 years "hands on" experience in healthcare work. Relator is also certified in the completion of MDS 3.0 with the American Association of Nurse Assessment Coordination. In 2009, Relator started working for Defendants as their assistant Clinical Reimbursement Coordinator and later was promoted to Clinical Reimbursement Coordinator. Relator was constructively terminated on February 18, 2015.

17. Defendant Preferred Care Inc. ("PCI") is a for-profit corporation incorporated in the State of Pennsylvania. PCI was registered for business in the Commonwealth of Kentucky from March 3, 2005, to April 24, 2014, with organization number 0607535. Following its failure to file its annual report, the Commonwealth of Kentucky revoked its authority to conduct business in the Commonwealth on September 9, 2015. PCI's principal office is located at 34 Locust Avenue, Gettysburg, PA 17325. PCI indirectly owns and operates skilled nursing facilities throughout Kentucky and the Named States and does business in Kentucky and the Named States.

18. Defendant Preferred Care, Inc. (with a comma) ("PCI II") is a for-profit corporation incorporated in the State of Delaware. PCI II is registered for business in the Commonwealth of Kentucky with organization number 844845 and does business as Preferred Care of Delaware, Inc. PCI II's principal office is located at 5420 West Plano Parkway, Plano, TX 75093. PCI II indirectly owns and operates skilled nursing facilities throughout Kentucky and the Named States and does business in Kentucky and the Named States.

19. Defendant Reliant Pro Rehab, LLC ("Reliant") is a for-profit corporation incorporated in the State of Delaware. Reliant is registered for business in the Commonwealth of Kentucky with organization number 0834052. Following its failure to file its annual report, the Commonwealth of Kentucky revoked its authority to conduct business in the Commonwealth on September 9, 2015. Reliant's principal office is located at 5212 Village Creek Drive, Plano, TX 75093. Reliant provides rehabilitation therapy at Defendants' skilled nursing facilities throughout Kentucky and the Named States and does business in Kentucky and the Named States.

20. Defendant Reliant Rehabilitation Holdings, Inc. ("Reliant II") is a for-profit corporation incorporated in the State of Delaware. Reliant is registered for business in the Commonwealth of Kentucky with organization number 0834096. Reliant II's principal office is located at 5212 Village Creek Drive, Plano, TX 75093. Reliant II provides rehabilitation therapy at Defendants' skilled nursing facilities throughout Kentucky and the Named States and does business in Kentucky and the Named States.

21. Defendant Preferred Care Partners Management Group, LP ("PCPMG") is a Texas limited partnership with headquarters at 5420 West Plano Parkway, Plano, TX 75093.

PCPMG exercises operational and managerial control over Defendants' skilled nursing facilities in Kentucky and the Named States. PCPMG does business in Kentucky and the Named States.

22. Defendant PCPMG, LLC ("PCPMG, LLC") is a Texas limited liability corporation with headquarters at 5420 West Plano Parkway, Plano, TX 75093. PCPMG, LLC is the general partner of PCPMG, which exercises operational and managerial control over Defendants' skilled nursing facilities in Kentucky and the Named States. PCPMG, LLC does business in Kentucky and the Named States.

23. Defendant Kentucky Partners Management, LLC ("KPM") is a for-profit corporation incorporated under the laws of Texas on June 19, 2012, and registered to conduct business in Kentucky on April 30, 2013, with organization number 0856432. KPM's principal office is located at 5420 West Plano Parkway, Plano, TX 75093. KPM is a "shell" corporation which conducts no meaningful business, other than to act as a financial conduit between Defendants' skilled nursing facilities in Kentucky and PCPMG.

24. Defendant Stanton Health Facilities, L.P. ("Stanton") is a for-profit corporation incorporated under the laws of Texas on May 3, 2012, and authorized to conduct business in the Commonwealth of Kentucky on May 31, 2012, with organization number 0830432. Stanton does business as Stanton Health and Rehabilitation Center and its principal office is located at 5420 West Plano Parkway, Plano, TX 75093.

25. Thomas D. Scott ("Scott") is an individual who resides in the state of Texas. Scott is president of PCI II, and he holds numerous other titles within Defendants' organization. On information and belief, Scott is the majority owner of the facilities within Defendants' organization.

## GOVERNMENT HEALTH INSURANCE PROGRAMS

### A. Health Insurance Through Medicare

26. The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program, was established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, (hereinafter "Medicare"). Medicare is a health insurance program administered by the Government of the United States that is funded by taxpayer revenue. Medicare is overseen by the United States Department of Health and Human Services ("HHS") through CMS.

27. Medicare is designed to be a health insurance program and to provide for the payment of hospital services, skilled nursing services, and durable medical equipment to persons over sixty-five (65) years of age, and certain other eligible individuals.

28. Reimbursement for Medicare claims is made by the United States through CMS, which contracts with private insurance carriers referred to as Medicare Administrative Contractors ("MACs") to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. §§ 1395h, 1395u. In this capacity, MACs act on behalf of CMS.

29. Medicare does not generally pay for long-term care. However, Medicare Part A will pay for medically necessary services provided by a SNF for up to 100 days to a resident who has been recently discharged from a hospital and is in need of skilled nursing services to recover from hospital treatment. *See* 42 U.S.C. §§ 1395d(a)(2), 1395f(a)(2)(B); 42 C.F.R. §§ 424.20, 409.20-.36.

30. Medicare pays for SNF care in two ways: directly, through the Prospective Payment System; or indirectly, through Medicare Advantage plans established under Medicare Part C.

**B. Federal Regulation of SNFs Receiving Medicare Reimbursement**

31. In the Omnibus Budget Reconciliation Act of 1987 ("OBRA"), Congress imposed a number of requirements on SNFs receiving Medicare reimbursement to protect the rights of residents at such facilities and ensure that they receive appropriate care. *See* Pub. L. No. 100-203, § 4201, 101 Stat. 1330, 1330-160 to -174, *codified as amended at* 42 U.S.C. § 1395i-3.

32. Among other things, OBRA requires SNFs regularly to collect and submit to CMS certain information on each resident, which is used to assess the resident's medical condition and the treatment provided to the resident. *See* 42 U.S.C. § 1395i-3(b)(3). This information is reported in a form jointly established by CMS and each State, which is referred to as an "MDS Assessment." Attached hereto as Exhibit 1 and incorporated herein by reference is a blank MDS Assessment form developed by CMS. Defendants used substantially similar forms to create and submit MDS Assessments to CMS and the Named States.

33. OBRA requires SNFs to complete and submit to CMS and to the appropriate State agency a comprehensive MDS Assessment for each resident (1) within 14 days of the resident's admission to the SNF; (2) promptly after a significant change in the resident's physical or mental condition; and (3) at least once every twelve months. *See* 42 U.S.C. § 1395i-3(b)(3)(C). More abbreviated assessments must be completed quarterly and upon the resident's entry into, and discharge from, the SNF. *See id.*; 42 C.F.R. § 483.20(c), (*l*).

34. Each MDS Assessment provides a variety of information about the resident's physical and mental condition and the resident's ability to perform certain ADLs such as walking and eating. *See* Ex. 1 §§ C-N, at 6-26. The MDS Assessment also reports the medications, therapy, and/or other skilled nursing services provided to the resident. *See id.* § O, at 27-29.

35. An RN must coordinate the completion of the MDS Assessment, and must sign the MDS Assessment to certify that it has been properly completed. *See* 42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(h), (i)(1); Ex. 1 § Z, at 38. Each individual who completes a portion of an MDS Assessment must sign to certify the accuracy of that portion of the assessment. 42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(i)(2); Ex. 1 § Z, at 38. The MDS Assessment must "accurately reflect the resident's status," 42 C.F.R. § 483.20(g), and should be based on direct observation of the resident's condition or detailed and accurate medical records. These requirements are designed to ensure the integrity and reliability of MDS Assessments.

36. CMS has promulgated and regularly updates a Resident Assessment Instrument Manual ("RAI Manual"), which provides extensive guidance to SNFs on how to collect and report the information contained in the MDS Assessment. The RAI Manual is designed "to facilitate the accurate coding of the MDS resident assessment and to provide assessors with the rationale and resources to optimize resident care and outcomes." CMS, Long-Term Care Facility Resident Assessment Instrument User's Manual, Version 3.0 ("RAI Manual"), at 3-1 (Sept. 2010).

37. The primary purpose of the MDS Assessment is to identify resident care needs that are addressed through a care plan developed for each resident. *See* RAI Manual at 1-5. SNFs are required to use MDS Assessments, which are essentially preliminary assessments, to conduct more extensive Care Area Assessments ("CAAs") for each resident that are focused on that resident's specific problems and needs. *See id.* SNFs must use the CAAs and the MDS Assessments to develop a comprehensive care plan for each resident "that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial

needs that are identified in the comprehensive assessment." 42 C.F.R. § 483.20(k)(1); *see also id.* § 483.20(d); 42 U.S.C. § 1395i-3(b)(4). A comprehensive care plan must be developed within 7 days after the completion of a resident's comprehensive MDS Assessment and periodically reviewed and revised after each subsequent MDS Assessment. 42 C.F.R. § 483.20(k)(2)(i). Moreover, the care plan must be prepared by an "interdisciplinary team, which includes the attending physician, a registered nurse with responsibility for the resident, and other appropriate staff in disciplines as determined by the resident's needs." *Id.* § 483.20(k)(2)(ii). SNFs are required to maintain all MDS Assessments completed within the previous 15 months in each resident's "active record" and "use the results of the [A]assessments to develop, review, and revise the resident's comprehensive plan of care." 42 C.F.R. § 483.20(d).

38. The CAA process requires SNFs to identify "care areas" that are "triggered" by the comprehensive assessment of a resident's medical condition and needs; evaluate each triggered care area by "doing an in-depth, resident-specific assessment of the triggered condition in terms of the potential need for care plan interventions"; decide what course of care to provide; and document all of these steps in the CAA process. RAI Manual at 4-14 to -17. CMS has prescribed twenty care areas that require a SNF to conduct further evaluation and care-planning, including "ADL Functional/Rehabilitation," which addresses a resident's "potential for improved functioning"; pain; dental care; the need for physical restraints; pressure ulcers; dehydration; nutritional status; and other conditions, symptoms, and areas of concern that are common in nursing home residents and are commonly identified or suggested by MDS Assessment findings. *See id.* at 4-17 to -42. A summary of the resident's care needs and the creation of a care plan is reported in comprehensive MDS Assessments. *See* Ex. 1 § V, at 32. SNFs are required to

document CAAs and care plans for each resident; these materials must be maintained in the resident's medical records but are not submitted to CMS.

### C. The Prospective Payment System

39. In the Balanced Budget Act of 1997, Congress established a Prospective Payment System ("PPS") for SNFs, pursuant to which CMS provides advance payments to SNFs for skilled nursing services provided to eligible residents. *See* Pub L. No. 105-33 § 4432, 111 Stat. 251, 414, *codified as amended at* 42 U.S.C. § 1395yy; *see also* 42 C.F.R. § 413.330, *et seq.*

40. In establishing the PPS for SNFs, Congress integrated reimbursement rates under the PPS with resident classification and assessment. *See* 42 U.S.C. § 1395yy(e)(4)(G). SNFs receive a predetermined *per diem* rate for each resident that is calculated based on the medical and physical condition of the resident and the resident's anticipated need for therapeutic and other skilled nursing services as reported in the resident's MDS Assessments. *See* 42 C.F.R. §§ 413.335-37, -.343. Specifically, each resident is assigned to one of over 50 mutually exclusive Resource Utilization Groups, referred to as RUGs, based on his or her clinical, functional, and resource-based criteria. *See id.* § 413.333. Payments under PPS depend on the RUG level assigned to each resident. *See id.* §§ 413.335-37. To receive reimbursement under Medicare Part A for post-hospital SNF care provided to a resident, a SNF must certify that the resident "has been correctly assigned to one of the Resource Utilization Groups designated as representing the required level of care." *Id.* § 424.20(a)(ii).

41. To receive payment under the PPS, SNFs must complete MDS Assessments more frequently than required by OBRA: MDS Assessments must be submitted on the 5th, 14th, 30th, 60th, and 90th days of a resident's stay at a SNF. *See* 42 C.F.R. § 413.343(b); *see also generally* 42 U.S.C. § 1395*l*(e). In submitting an MDS Assessment, a SNF must select an Assessment

Reference Date ("ARD") as of which information in the MDS Assessment is reported. The information reported in each field of the MDS Assessment is based on a 7- or 14-day "look-back" period preceding the ARD. *See* RAI Manual at 2-8, 2-15. However, a SNF is allowed some flexibility in setting ARDs: there is a window of 4 to 9 days before each required MDS Assessment, and a SNF may add 1 to 9 "grace days" to the required submission date. *Id.* at 2-43. Thus, for example, the ARD for a 14-day MDS Assessment can be set as early as the resident's 11th day at the SNF or, through the addition of grace days, as late as the 19th day. *Id.* Grace days may be added to address "situations when an assessment might be delayed (*e.g.*, illness of RN assessor, a high volume of assessments due at approximately the same time) or additional days are needed to more fully capture therapy or other treatments." *See id.* at 2-41.

42. A properly completed MDS Assessment must be submitted within 14 days of the MDS Assessment's ARD in order for a SNF to receive full reimbursement. *See* 42 C.F.R. §§ 413.337(c); 413.343, 483.20; RAI Manual at 2-45. (A SNF receives a low, default reimbursement rate for days covered by any MDS Assessment that is not timely received by CMS.) These MDS Assessments must contain a RUG level, which is reported in Section Z of the MDS Assessment. *See* Ex. 1 § Z, at 38. The RUG level is determined based on the information concerning ADLs and therapy or other rehabilitative services reported in the resident's MDS Assessment. *See* RAI Manual at 6-3. For example, the RUG level "RUX" (Rehabilitation Ultra, Extensive Services) is appropriate only for a resident who has an ADL score of 11 to 16, receives 720 minutes of therapy or more per week, and requires certain other forms of specialized care. *See id.* at 6-24.

43. The signature page for each MDS Assessment makes clear that it may be used as a basis for payment by Medicare:

> I certify that the accompanying information accurately reflects resident assessment information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility on its behalf.

Ex. 1 § Z, at 38. The RN Assessment Coordinator must also provide the date that the MDS Assessment is completed. *See id.*

44. In 2011, the *per diem* levels for rural SNFs varied from as high as $747.84 per day for RUG level RUX (Rehabilitation Ultra, Extensive Services) to as low as $192.25 for level PA1 (Reduced Physical Function). *See* CMS, Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2011, 75 Fed. Reg. 42,886, 42,908-909 (July 22, 2010). Manipulating the RUG level assigned to a resident could thus more than triple the *per diem* payment for that resident.

45. In addition to being accurately reported on a resident's MDS Assessment, skilled nursing services for which a SNF seeks reimbursement must be reasonable, medically necessary, and consistent with professionally recognized standards of care. *See* 42 U.S.C. §§ 1395y(a)(1)(A); 1320c-5(a). In the context of skilled rehabilitation therapy, this means that the services furnished must be ordered by a physician; consistent with the nature and severity of the resident's individual illness, injury, or particular medical needs; consistent with accepted standards of medical practice; and reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c08.pdf.

46. SNFs bill Medicare-covered services on a Uniform Bill 04 ("UB-04"), or the electronic equivalent. *See* Medicare Claims Processing Manual Ch. 6, § 30, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c06.pdf. An example of a blank Form UB-04 used for Medicare billing is attached hereto as Exhibit 2 and incorporated herein by reference. Defendants submitted claims to CMS or its agents on substantially similar forms.

47. The contents of a Form UB-04 for a resident depend on the MDS Assessments submitted for that resident. Each MDS Assessment can readily be traced to one or more claims submitted on Form UB-04s that seek reimbursement for the services reported in that MDS Assessment.

48. For *per-diem* billing, a SNF enters on the Form UB-04 in field 44 – "HCPCS / Rate / HIPPS Code" – the RUG level assigned to the Health Insurance Prospective Payment System ("HIPPS") code field in Section Z of the resident's MDS Assessment, followed by a two-digit code reflecting the type of Assessment – *i.e.*, a 5-day MDS Assessment, 14-day MDS Assessment, *etc.* – in which the RUG level was reported. *See* Medicare Claims Process Manual, Ch. 25, at 22, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c25.pdf. Based on the SNF's location, the RUG level, and the MDS Assessment type, CMS automatically determines the number of days for which reimbursement should be provided, and the appropriate *per diem* rate. *See id.*, Ch. 6, § 30.6.2-.3. For example, the RUG level reported in the 5-day MDS Assessment determines the reimbursement rate for a resident's first 14 days at a facility; the 14-day MDS Assessment determines the rate for days 15 to 30; and so on. *See* RAI Manual at 2-45.

49. To receive reimbursement, a SNF must submit Form UB-04s on a regular basis, and upon a Medicare-covered resident's discharge, exhaustion of benefits, or decrease in level of care to less than skilled care. *See* Medicare Claims Process Manual, Ch. 6 § 40. Bills must be submitted, and are processed in sequence. *See id.* § 40-1. Thus, a bill corresponding to a 14-day MDS Assessment must be submitted before a bill can be submitted for a 30-day MDS Assessment, and so on.

**D. Cost Reporting for Medicare and Medicaid Reimbursement**

50. Congress expanded the PPS to SNFs for cost reporting periods beginning on or after July 1, 1998. 42 C.F.R. § 413.330. At the end of its annual cost reporting period, the SNF must submit cost reports detailing the expenses and revenues for its facility and Medicare resident days by RUG category. The SNF is required to accurately report its actual payments to suppliers, including the skilled therapy providers. The annual cost report is the final claim and is submitted on CMS Form 2540-10. Annual cost reports constitute the final accounting of the facility's federal program reimbursement.

51. As a condition of payment, the SNF must certify in its annual cost report that all data is accurately and truthfully reported and that it has complied with all applicable laws and regulations. Every cost report also contains a Certification which must be signed by the chief administrator of the provider or a responsible designee of the administrator. The CMS Form 2540-10 SNF Cost Report certification page includes the following statement: *Misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or*

*indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.*

52. The cost report certifier is also required to certify that: *[T]o the best of my knowledge and belief, it [the SNF Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.* The Paperwork Reduction Act of 1995 requires that the private sector be informed as to why information is collected and what the information is used for by the government. In accordance with §§1815(a) and 1861(v)(1)(A) of the Act, providers of services participating in the Medicare program are required to submit annual information to achieve settlement of costs for health care services rendered to Medicare beneficiaries.

53. In addition, 42 C.F.R. 413.20 and 413.24 require adequate cost data and cost reports from providers on an annual basis. In accordance with these provisions, Form CMS-2540-10 must be completed by all SNFs and SNF health care complexes. The information reported must conform to the requirements and principles set forth in the Provider Reimbursement Manual (CMS Pub. 15-*1*). The instructions contained in this chapter are effective for cost reporting periods beginning on or after December 1, 2010. In addition to Medicare reimbursement, these forms also provide for the computation of reimbursable costs applicable to Title XIX (Medicaid).

## E. Medicare Advantage Plans

54. In addition to direct reimbursement of SNFs for nursing care, Medicare also permits eligible individuals to cover the cost of skilled nursing care by enrolling in Medicare+Choice Plans or Medicare Advantage Plans ("MA Plans") established under Medicare Part C. Medicare Part C enables private insurers to contract with CMS to establish an MA Plan, which offers individuals eligible for Medicare the same benefits they would receive under Medicare, and may also offer additional benefits not covered by Medicare. *See* 42 U.S.C. §§ 1395w-21, 1395w-22.

55. In exchange for covering the costs of prescription drugs and medical or skilled nursing services covered by Medicare, MA Plans receive from CMS a monthly capitation rate for each eligible participant. *See* 42 U.S.C. § 1395w-23; 42 C.F.R. §§ 422.304-422.308. The capitation rate is risk-adjusted for each participant based on risk diagnosis data provided by MA Plans to CMS. *See* 42 U.S.C. § 1395w-23(a)(1)(C); 42 C.F.R. §§ 422.308(c). Additionally, MA Plans are permitted, but not required, to charge a premium to plan participants, which covers the cost of any additional services offered by the MA Plan in excess of those covered by Medicare. *See* 42 U.S.C. § 1395w-24(b). The majority of participants in MA Plans pay no premium. In practice, the bulk of MA Plans' revenue comes from monthly capitation payments rather than premiums.

56. In 2011, MA Plans received $124 billion from CMS (compared to about $5.6 billion in premiums from plan participants), and covered over 11.5 million people nationwide. Over 25% of those receiving Medicare benefits in the United States did so through an MA Plan. Paying for care through MA Plans costs CMS about 10% more on average than direct reimbursement through the PPS.

57. Because MA Plans receive federal funds to cover the cost of providing medical and skilled nursing care to insureds, they are subject to substantial regulation and oversight by CMS – including oversight designed to prevent federal funds from being lost to fraud, waste, and abuse. An MA Plan contracting with CMS must agree to establish an effective compliance program to prevent fraud, waste, and abuse. *See* 42 C.F.R. § 422.503(b)(4)(vi). Additionally, HHS is required to provide for the annual auditing of MA Plans, including their level of Medicare utilization and costs. *See* 42 U.S.C. § 1395w-27(d)(1). These requirements help ensure that CMS's risk-adjusted capitation payments to MA Plans accurately reflect MA Plan participants' medical condition and needs.

58. MA Plans contract with SNFs to provide skilled nursing services for MA Plan participants. Under these contracts, reimbursement is typically based on information reported in the MDS Assessment for each resident, and SNFs must complete an MDS Assessment accurately reflecting the resident's condition to receive payment. A resident's MDS Assessment is used by an MA Plan for the MA Plan's internal reimbursement purposes, and may be used to provide risk diagnosis data to CMS so that CMS can determine the appropriate risk adjustment to the capitation rate for that resident. The MDS Assessment thus affects both a SNF's reimbursement from an MA Plan and the MA Plan's capitation payments from CMS.

**F. TRICARE**

59. TRICARE covers the same skilled nursing services as Medicare. *See* 32 C.F.R. § 199.4(b)(1)(vi). The regulatory authority implementing the TRICARE program provides reimbursement to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies. *See* 10 U.S.C. § 1079(j)(2), (4).

60. TRICARE, like Medicare, pays only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i). TRICARE follows Medicare's PPS and RUG level methodology and assessment schedule, and beneficiaries are assessed using the same MDS Assessment form used by Medicare. *See* TRICARE Reimbursement Manual 6010.58-M, Ch. 8, § 2 (Dec. 3, 2010), *available at* http://manuals.tricare.osd.mil/DisplayManual.aspx?SeriesId=T3TRM&TR08=22#TR08. Similarly, services provided to a resident covered by TRICARE are billed on the same Form UB-04 and depend on the RUG levels reported in the MDS Assessment. *See id.*

**G. Health Insurance Through Medicaid**

61. Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, provides for federal grants to support State Plans for Medical Assistance, and is commonly known as the Medicaid program. Each State has established and administers a Medicaid program to pay for medical and skilled nursing services, durable medical equipment, and prescription drugs for disabled or financially needy individuals, which must conform to certain requirements to receive federal financial support. *See* 42 U.S.C. § 1396a.

62. The States directly pay providers for services covered by Medicaid, with the States obtaining the federal share of the payment from accounts which draw on the United States Treasury. *See* 42 U.S.C. § 1396b; 42 C.F.R. §§ 430.0-430.30.

63. Cost reports submitted to the Named States' Medicaid agencies are derived in substantial part from information prepared and submitted in facilities' Medicare cost reports. Hence false information in the Medicare cost reports will also cause false claims for reimbursement on the Named States' Medicaid programs as well.

## THE FEDERAL FALSE CLAIMS ACT

64. The federal FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). It similarly imposes liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.* § 3729(a)(1)(G).

65. The FCA defines "knowing" and "knowingly" with respect to information as meaning that the person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

66. The FCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that –

> (i) is presented to an officer, employee, or agent of the United States; or
>
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government –
>
>> (I) provides or has provided any portion of the money or property requested or demanded; or
>>
>> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A).

67. Accordingly, each MDS Assessment and each Form UB-04 submitted to CMS, to MACs acting on CMS's behalf, or to other government healthcare programs constitutes a "claim" within the meaning of the FCA, because these documents are designed to induce, and do ordinarily induce, the payment of money by CMS. Additionally, each MDS Assessment is a record or statement that is material to a Form UB-04.

68. However, as the FCA makes clear, requests for money submitted to a federal grantee, contractor, or other recipient may also constitute a claim, if money requested is being spent to advance a Government purpose and a portion of the money is provided by the federal government. Thus, each Form UB-04 and each MDS Assessment submitted to government healthcare programs or Fiscal Intermediaries acting on their behalf – and each request for reimbursement and each MDS Assessment submitted to an MA Plan – constitutes a "claim" within the meaning of the federal FCA. Further, each MDS Assessment constitutes a record or statement material to a Form UB-04 or other request for reimbursement.

69. As detailed below, the second means by which Defendants committed fraud was by causing their facilities nationwide to submit inflated cost reports to the federal and Named States' governments. Each false cost report constitutes a "claim" within the meaning of the Connecticut False Claims Act, Connecticut General Statutes § 17b-301a, *et seq.*; the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*; the Iowa Medicaid False Claims Act, Iowa Code § 685, *et seq.*; the Louisiana False Claims Act/Medical Assistance Programs Integrity Law, 46 La. Rev. Stat. Ch. 3 § 437.1, *et seq.*; the Maryland False Health Claims Act, Md. Code Ann., Health-Gen § 2-601, *et seq.*; the New Mexico False Claims Act, N.M.S.A. § 27-14-1, *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. § 63-5053, *et seq.*; and the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001, *et seq.*

**DEFENDANTS' SCHEME TO DEFRAUD MEDICARE, TRICARE, AND MEDICAID**

70. Defendants' scheme to defraud government healthcare programs took two distinct forms:

(i) Defendants engaged in a scheme to defraud Medicare and TRICARE by submitting numerous false or fraudulent statements and false or fraudulent claims that contained fraudulently-inflated RUG levels and that falsely represented that care was being provided in accordance with contemporaneously-established care plans and physician certifications. To conceal and facilitate their fraudulent scheme, Defendants also routinely falsified medical records. Each of the Defendants knew, or was deliberately ignorant or reckless in not knowing, that the claims and statements generated by these improper practices claims were false and/or fraudulent;

(ii) Defendants required individual facilities to contract with a regional captive management company to manage virtually every aspect of running a skilled nursing facility. Each individual facility paid 4% and at times 5% of their adjusted gross revenue to their management company. However, these regional management companies did no management work and did "not have any personnel or facilities to provide such services." Instead the management companies outsourced the management to PCPMG and agreed to pay a fee of $360,000 per month for PCPMG to manage their facilities. In this way, Defendants "skimmed" revenue from each of their facilities nationwide and caused them to submit inflated cost reports to Medicare and the Named States' Medicaid programs. Each of the Defendants knew, or was deliberately ignorant

or reckless in not knowing, that the claims and statements generated by these improper practices claims were false and/or fraudulent

## A. Relator's Knowledge of the Fraudulent Scheme

71. Relator was employed from December 2012 until approximately February 2015 as a Clinical Reimbursement Coordinator by Stanton Health and Rehabilitation Center ("Stanton"). Relator directly witnessed the creation and submission of numerous false statements and claims for Medicare reimbursement. The description of the fraudulent scheme below is based on Relator's personal knowledge.

72. When Relator first started work at Stanton, it was one of 21 facilities operated by Extendicare Health Services in Kentucky ("Extendicare"). However, following the indictment of three members of staff at the Brownsville facility for criminal abuse and wanton endangerment of residents and a lawsuit in which dozens of former residents made similar allegations, Extendicare sold the facilities to Defendants in or around July 2012. At the time of the sale, the Kentucky facilities were reported to have generated $135 million in revenue in 2011 and earnings from operations of $17.5 million. Relator had been at Stanton for three years at that point and was well placed to compare the two operators, Extendicare and Defendants. Incredibly, following the transaction, Relator witnessed the standard of care ***decrease*** with a renewed emphasis on profit, particularly on Medicare claims, even if it meant fraud.

73. Stanton is a skilled nursing facility located in Stanton, Kentucky. The facility maintains 81 beds and is made up of two units, the North Unit and the South Unit. The South Unit, with 35 residents, was known as the "rehab" unit where residents received regular rehabilitation therapy and were mostly Medicare residents. The North Unit, with 46 residents,

was known as the "skilled" unit where residents received nursing care only and were mostly Medicaid residents.

74. Stanton's resident mix was mostly Medicare and Medicaid with few private payors. Virtually all new admissions were "dual eligible" residents, that is to say residents who were eligible for both Medicare and Medicaid benefits. Defendants required the facility to maintain at least 12 Medicare residents, so whenever a Medicare resident exhausted his/her100 days of skilled nursing care and fell into the Medicaid population, there was pressure to find a way to discharge a Medicaid resident. By way of example, one resident who had been a Medicare recipient and exhausted his 100 days of Medicare coverage (like many other residents) fell into Medicaid coverage, which does not pay as well. When the resident went outside to smoke a cigarette during non-designated smoking hours, the Administrator expelled the resident from Stanton.

75. In Relator's role as the Clinical Reimbursement Coordinator, Relator was responsible for reviewing medical records and completing and submitting MDS Assessments for residents at Stanton. To complete these tasks, Relator had regular contact with residents and nurses, therapists, the Administrator (at different times, Tom Davis and Joe Donchatz), the Director of Nursing (Terry Ratcliff), the Director of Rehabilitation (Tammy Rose), the National Reimbursement Coordinator (Emma Green), the Regional Reimbursement Coordinator (Dana Thompson), the Regional Director of Operations (Mark Wilson), and Defendants' Chief Operating Officer (Kirk Parsons).

76. Therapy at Stanton was provided through Defendants Reliant and Reliant II. On information and belief, both of these Defendants are captive corporations under the Preferred

Care umbrella and their principal offices are adjacent to those of the other Texas corporate Defendants.

77. Relator and staff nurses would discuss MDS Assessments and related billing matters because billing must be closely coordinated with the submission of MDS Assessments. These matters were discussed on a weekly basis. However, the Business Office Manager also attended these meetings even though appropriate medical care is not within the purview of the office manager because Defendants were focused on maximizing Medicare residents' 100 days of benefits.

78. In the course of developing and documenting care plans for residents, Relator had extensive contact with Stanton's Director of Rehabilitation, Tammy Rose, as well as rehabilitative therapists.

79. Relator also worked under Regional Directors of Clinical Reimbursement employed by Defendants. Relator's work at Stanton was initially overseen by Melissa Green and subsequently Dana Thompson. The Regional Director of Clinical Reimbursement was responsible for billing at all Defendants' facilities in Kentucky. Although Relator's direct supervisor was the Facility's Administrator, Tom Davis, Green and Thompson both provided instruction and direction to Relator on the completion of MDS Assessments.

## B. Defendants Systematically Encouraged Fraudulent Practices

80. Defendants created a work culture that focused on maximizing profits at the expense of resident care and that systematically incentivized and pressured employees to resort to any means – including fraud – to increase profits.

81. Senior executives at Defendants' Plano, Texas headquarters established Medicare reimbursement goals for the facilities, which was a targeted average *per diem* reimbursement rate for Medicare residents. Residents' RUG levels, and hence income to the facility, is intended to

represent the care (therapy and nursing) provided to the resident according to their needs. It follows that one cannot predict what level of RUG a resident will be. But that is precisely what senior executives in Plano sought to do. Yet, these executives were not in a position to review the medical records of residents at each facility, and thus the Medicare goal did not reflect an assessment of the RUG levels that were actually appropriate for residents at these facilities. Instead, these goals were set so as to maximize the profits derived from each facility.

82. Defendants monitored each facility's RUG levels by requiring the submission of a weekly report called the "Medicare Weekly Summary" in which the facilities listed every Medicare resident, their RUG rate, and how many of the 100 covered Medicare days remained for the individual residents. Furthermore, Relator received a monthly report listing the RUG scores for all of Defendants' other Kentucky facilities that ranked them according to reimbursement levels. There was no such report for Medicare.

**C. Defendants Pressured Staff to Upcode to Meet Financial Goals**

83. As explained above, the *per diem* rate for skilled nursing services under Medicare Part A and TRICARE is determined by the RUG level reported in the MDS Assessments submitted for each resident. Defendants were keenly aware of this fact and used several strategies to fraudulently increase the RUG levels and resulting reimbursement rates assigned to each resident covered by Medicare or TRICARE.

84. Regional Reimbursement Specialists such as Green and Thompson were responsible for ensuring that each of Defendants' Kentucky facilities was meeting its Medicare goals. Green was promoted to National Reimbursement Coordinator and went on to become responsible for ensuring that all facilities were meeting the company's Medicare goals.

85. Whenever Green or Thompson visited Stanton, they reviewed every single individual resident's RUG scores and would alter MDS assessments if doing so – for example

changing the date or backdating the document – could increase RUG scores. Otherwise the Regional Reimbursement Specialist would suggest to Relator and the Director of Rehabilitation ways to upcode residents' MDS Assessments so that the facility could achieve higher RUG levels.

86. Whenever Relator challenged either Green or Thompson, asking "How is this legal?" – they would invent some implausible excuse. On one occasion, Thompson said words to the effect that it was simply necessary to reach their reimbursement goals and that Relator's job was to get the highest level of reimbursement with no questions asked.

87. After Green was promoted to National Reimbursement coordinator, she became responsible for "training" staff at facilities across the country on how to upcode bills to maximize revenue. On a number of occasions, Green visited Stanton and spoke with Relator about billing. Green instructed Relator that she and anyone involved in billing should coordinate with the therapy department in order that therapists would know how much therapy to administer to achieve Defendants' RUG goals. Green also instructed Relator to move ARDs, use grace days, and brazenly falsify dates if any of these tactics could increase the RUG level billed.

**D. Defendants Exploited All 100 Days of Medicare Coverage, Providing Medically Unnecessary Levels of Therapy Before Abruptly Stopping Therapy After 100 Days**

88. As previously stated, Medicare Part A will pay for medically necessary services provided by a SNF for up to 100 days to a resident who has been recently discharged from a hospital and is in need of skilled nursing services to recover from hospital treatment. The goal is to help the resident to regain function and go home. However, Defendants treated the 100 days of Medicare coverage as a period of ***guaranteed income*** for the facility and would monitor how many days remained for any given resident. The purpose of this monitoring was two-fold: to be able to exploit every single day of Medicare coverage; and, second, to avoid providing therapy to

a resident for whom they could no longer bill Medicare. The following examples illustrate the effect of Defendants' fraudulent policies, and the bills submitted to Medicare with respect to each of these residents themselves constitute false claims.

**Medicare Resident C.B.**

89. For example, resident C.B., known to Relator, was an elderly, diabetic lady who was admitted as a Medicare resident. C.B. immediately received all three therapy services (physical therapy, speech therapy and occupational therapy) at such a level that she was billed as an RU resident (the highest billable rate). When her 100 days of Medicare coverage ended and she fell back into Medicaid only coverage, all therapy immediately ceased. C.B. returned to hospital on at least one other occasion and requalified for Medicare coverage.

90. On her return to Stanton, Medicare coverage renewed, C.B. was once again a profit center for Defendants and she received all three therapy services to the level of RU. When C.B. once again exhausted her Medicare benefits, therapy immediately stopped despite the fact that, in Relator's view, she still needed at least some therapy to prevent muscle contractures. In fact, C.B. was positively neglected and developed a urinary tract infection ("UTI"). Due to consistent understaffing, this infection was misdiagnosed as simple nausea. On the morning that she died of her UTI, C.B. was throwing up and was given Phenergran, a drug used to treat motion sickness.

91. Immediately after C.B.'s death, Relator was instructed to review C.B.'s medical record and remove any evidence that the facility was negligent and/or to create and add any missing documentation. Relator looked at the file and left it unchanged.

92. Relator is aware however, that the Director of Nursing, Terry Ratliff, would frequently order Olivia Creech, manager of Stanton's South Unit, to alter resident files by

creating and backdating missing documentation. When Relator challenged Ms. Creech on these practices, Ms. Creech would claim that she had spoken with all the care providers concerned and they had given permission for her "correcting" the medical files.

**Medicare Resident K.T.**

93. Another victim of Defendants' relentless pursuit of profit over resident care was K.T., who also was known to Relator. K.T. was an elderly man who was admitted many years earlier as a Medicare resident. Over the years, K.T. had returned to the hospital on several occasions and thereby requalified for 100 days of SNF Medicare benefits at Stanton several times. During those 100 days, K.T. received all three therapy services at an RU level. When his benefits were exhausted, K.T. fell back into Medicaid coverage and therapy ceased despite the fact that K.T. had difficulty swallowing and needed speech therapy to help him.

94. K.T. developed aspirational pneumonia as a result of his inability to swallow, which could have been avoided if he had been receiving the therapy he needed. K.T. suffocated and died as a result in September 2013.

**Medicare Resident P.T.**

95. Medicare resident P.T. was also known to Relator. P.T. was an elderly man who was admitted as a Medicare resident who could not eat in the usual manner but instead required a feeding tube directly into his stomach. P.T. received all three therapy services at an RU level during his 100 days of Medicare benefits. When his benefits were exhausted, P.T. fell back into Medicaid coverage and therapy ceased despite the fact that P.T. had difficulty swallowing and needed speech therapy to help him and needed physical therapy to prevent muscle contractures to which he was prone.

96. P.T. developed aspirational pneumonia as a result of his inability to swallow, which could have been avoided if he had been receiving the therapy he needed. P.T. suffocated when a mucus plug lodged in his throat causing brain death. When P.T. was taken to the hospital he exhibited a full body contracture in which all the muscles of his body had tightened as a consequence of his lack of physical therapy. P.T. died eight days later.

**Medicare Resident K.R.**

97. Medicare resident K.R. was also known to Relator. K.R. was a schizophrenic man who did not receive adequate care, although he did receive all three therapies at the RU level for his 100 days of Medicare coverage. After he fell into Medicaid benefits, all therapy stopped and he became immobile, being unable to get out of bed and walk.

98. Despite his complaints, K.R. was abandoned to his misery. Relator observed Facility Administrator Joe Donchatz close the door on K.R. while the man was trying to address him. K.R. developed advanced bed sores, otherwise known as pressure ulcers – due to a lack of therapy, and/or due to the failure to aid K.R. to turn in his bed. K.R. developed a severe Stage 4 pressure sore on his coccyx that went down to and exposed his bone.

99. In Relator's experience, even such a serious wound be ignored at Stanton because the facility was understaffed and basic wound dressings were in scarce supply. Indeed, as incredible as it sounds, staff were ordered not to waste time dressing wounds. On this occasion, the nurse charged with K.R.'s care, Rebecca Dechara, did dress K.R.'s wound. When DON Terry Ratliff found out that the nurse had performed this service in defiance of the standing order, the nurse was suspended for three days and ultimately terminated.

100. K.R. died on May 29, 2015 from sepsis caused by the Stage 4 bed sore.

**E. Defendants Billed for Therapy That Was Not Provided**

101. Defendants also billed Medicare for therapy that was not actually provided. One of the consequences of insisting that all Medicare residents received all three therapies – physical therapy, occupational therapy, and speech therapy – is that residents often refused to participate. Relator observed on many occasions where the resident did not participate in therapy but simply sat in the gymnasium. Nevertheless, Stanton submitted claims for the care that was not provided. On several occasions, Relator walked into the gymnasium and saw residents sleeping in their wheelchairs.

**F. The Composition of a RUG Code**

102. A RUG code has three letters, *e.g.*, "RUC." In this example, the first letter "R" stands for rehabilitation therapy because the resident is receiving rehab services. The middle letter "U" represents the amount of therapy the resident receives. And, the third letter "C" represents the resident's ADL score, which is the amount of skilled nursing that the resident needs. As detailed below, Defendants enforced a corporate-wide policy of fraudulently increasing the second and third letters in their Medicare residents' RUG codes.

| R | U | C |
|---|---|---|
| All residents receiving at least 45 minutes of therapy have codes that begin with "R." | This letter represents the level of rehabilitation therapy; in this case, "U" for "ultra high," *i.e.*, at least 720 minutes in the last 7 days. | This letter represents the ADL score, *i.e.*, how well a resident can perform the "activities of daily living." In this case the resident is highly dependent with a "C," as opposed to "moderately dependent" which is a "B," and "mostly independent," which is an "A." |

**G. Defendants Provided Medically Unnecessary Rehabilitative Therapy and Fraudulently Manipulated Reporting of Therapy Minutes**

103. In addition to fraudulently increasing ADL scores, Defendants also billed Medicare for unnecessary rehabilitative therapy and manipulated their reporting of therapy

minutes to make it appear that Medicare residents were receiving more therapy than they were actually provided.

**Table 1. FY 2011 *Per Diem* Medicare Reimbursement Rates for Rural SNFs[1]**

| **Rehabilitation Level** (Total Therapy Minutes over 5 Days) | **Combined ADL Score** | | |
|---|---|---|---|
| | **0-5 Class A** | **6-10 Class B** | **11-16 Class C** |
| Rehab Ultra (over 720 minutes) | RUA $548.80 | RUB $575.94 | RUC $633.24 |
| Rehab Very High (500-720 minutes) | RVA $430.63 | RVB $480.39 | RVC $506.03 |
| Rehab High (325-500 minutes) | RHA $388.83 | RHB $418.99 | RHC $440.10 |
| Rehab Medium (150-325 minutes) | RMA $383.62 | RMB $392.66 | RMC $404.73 |
| Rehab Low (45-150 minutes) | RLA $300.82 | RLB $355.10 | |

104. As the table illustrates, increasing a resident's ADL score even by one class – for example, from RUB to RUC – can increase the *per diem* reimbursement for that resident by as much as $57 per day, a 10% increase in the *per diem* rate. Increasing the score by two classes can increase *per diem* rates by as much as $84 per day (a 15% rate increase). Falsely inflating self-performance and support-provided codes thus reliably increases *per diem* rates, but it is a difficult fraud to detect because one must observe the assistance provided to the resident or review the resident's daily charting to determine whether these codes are accurate.

105. As Table 1 illustrates, the total therapy minutes provided to a resident directly affects the resident's RUG level and resulting *per diem* reimbursement rate. On average, increasing the intensity of therapy by just one level increases the *per diem* rate by over $60, or 12 to 20%. In particular, the maximum level – Rehabilitation Ultra – has *per diem* reimbursement rates that are $95 to $127 (over 20%) higher than the level immediately below it (Rehabilitation

[1] CMS, Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2011, 75 Fed. Reg. at 42,908.

Very High). Defendants were keenly aware of this fact and employed a variety of fraudulent strategies to classify as many residents as possible in the Rehabilitation Ultra level.

106. Medicare requires (as does TRICARE) that rehabilitative therapy be reasonable and medically necessary. In Relator's experience at Stanton, virtually every new Medicare admission was treated as an "RU" resident whether they needed therapy or not. If ever a resident was coded at less than an RU, the Regional Reimbursement Coordinator, either Green or Thompson, would want to know why. From conversations with Tammy Rose, Relator knew that the Director of Rehabilitation was under pressure to find ways to achieve the desired RU status for the resident often by instructing therapists to treat occupation therapy, speech therapy and physical therapy as inter-changeable and provide additional minutes of any one of the three forms of therapy.

**H. Moving Assessment Reference Dates to Achieve Artificially-High RUG levels**

107. Despite the efforts of MDS nurses and therapists at Defendants' facilities, it was not always possible to fit the maximum amount of therapy minutes into the appropriate 7-day look-back period. The look-back periods are the 7 days preceding the Assessment Reference Date ("ARD") for an MDS Assessment, which are set at 5, 14, 30, 60, and 90 days after a resident is admitted to the facility. If the ARD fell at the end of a week, or therapy was not scheduled in advance, the therapy minutes during the look-back period would often not reach the 720-minute maximum.

108. To overcome this difficulty, MDS nurses at Stanton would take advantage of the fact that CMS permits a SNF to adjust the ARD by setting it a few days before the deadlines above, or extending it past the deadlines, by adding a number of "grace days" and scheduling extensive therapy during the reporting period. This practice was fraudulent. The amount of

therapy minutes reported, and the resulting RUG level, should "accurately reflect the resident's status." 42 C.F.R. § 483.20(g); *see also id.* § 424.20. Where the selection of the ARD is manipulated to generate an amount of therapy minutes that does not correspond to the treatment normally provided to the resident, the resulting RUG level does not accurately reflect the resident's status. Additionally, grace days may be added only for legitimate reasons such as the MDS nurse's illness or the need to more accurately reflect the amount of therapy provided to a resident. RAI Manual at 2-41. Defendants pressured Relator and Tammy Rose improperly to use grace days for the opposite purpose: to ***misrepresent*** the amount of therapy actually provided to residents solely for the purpose of increasing the amount of reimbursement they could seek on behalf of Defendants facilities.

109. Defendants' method of reporting therapy minutes conveyed the false impression that residents were receiving far more therapy than they were actually provided, and resulted in RUG levels that did not accurately reflect the condition and needs of residents. Accordingly, each of the MDS Assessments containing therapy minutes inflated in this manner constituted a false statement or claim, and subsequent bills to government healthcare programs based on those MDS Assessments were false claims. Defendants knew, or were deliberately ignorant or reckless in not knowing, that these statements and claims were false and fraudulent.

**I. "Ramping" of Therapy Around Assessment Reference Dates**

110. In addition to the foregoing strategies for falsely inflating therapy minutes, Defendants also manipulated the timing of therapy reporting to avoid having to actually incur the cost of providing the amount of therapy reported in residents' MDS Assessments. Specifically, Defendants took advantage of the fact that for purposes of determining RUG levels, the number of therapy minutes provided is only measured during periodic 7-day look-back periods.

Defendants arranged for residents to receive the maximum amount of rehabilitative therapy (720 minutes) during these look-back periods but provided far lower amounts of therapy outside these periods.

111. When reviewing medical records and previously submitted MDS Assessments for residents, Relator noticed a consistent pattern: residents would receive 720 minutes or more of rehabilitative therapy during look-back periods and receive half or less that amount of therapy – typically around 350 to 400 minutes or less – during periods outside the look-back periods.

112. As a result, CMS often had been billed for therapy at Rehab Ultra rates, but the resident had only been provided Rehab Ultra levels of therapy (720 minutes of therapy) for some of these weeks. During the other weeks, the resident had been provided far lower levels of therapy (200-400 minutes), which would have triggered a significantly lower RUG level and a correspondingly lower level of reimbursement. Moreover, the fact that the resident was provided far lower levels of therapy outside the 7-day look-back periods used for his or her MDS Assessments shows that Defendants recognized that the levels of care provided to the resident during these periods were excessive and not medically necessary.

113. This residents MDS Assessments submitted to CMS were false and fraudulent, because they reported therapy minutes that were not medically necessary and because they contained RUG levels that did not reflect the actual amount of therapy needed by, or provided to, the resident. The bills submitted to CMS for this resident were likewise false because they were based on falsified MDS Assessments and because they contained the fraudulently-inflated RUG levels reported in those MDS Assessments. Tammy Rose, and the therapists working at Williams' direction knew, or were deliberately ignorant or reckless in not knowing, that these

MDS Assessments and resulting bills were false. Tammy Rose, and the therapists caused the MDS Assessments to be used and caused the resulting bills to be presented to CMS.

**J. Avoidance of "Extra" Minutes**

114. Defendants manipulated the amount of therapy for residents in order to maximize their reimbursement. However, when the RUG target was reached (in the case of an RU resident that would be 720 minutes of therapy during the 7-day look back period) all therapy would stop. If ever a resident received any therapy in excess of the RUG threshold (for example, 735 minutes), Tammy Rose would instruct the therapist that the "extra" 15 minutes should not have been provided and any minutes over and above any threshold should in the future be avoided.

115. This practice is indicative of therapy provided not for reasons of medical necessity, but for profit. By the same token, the practice also results in the withholding of medically-necessary therapy where a resident needed therapy above the threshold level.

**K. Fraudulent Tactics to Increase the ADL Code (the Third Letter)**

116. An ADL score is a number between 0 and 16 that reflects a resident's need for nursing staff assistance to perform four types of activities of daily living that are often challenging for older or sicker residents: bed mobility, transfer, toilet use, and eating. *See* RAI Manual at 6-18. The score depends on observation of incidents in which the resident requires staff assistance to perform each activity.

117. These incidents are summarized by assigning two numbers to each activity corresponding to the resident's capacity for self-performance and the amount of support the resident was provided. *See* Ex. 1 § G, at 15-16. The self-performance figure is a number between 0 and 4, with 0 indicating that the resident is "independent" and requires "no help or staff oversight at any time," and 4 indicating the resident's "total dependence" and need for "full

staff performance every time during entire 7-day period." *Id.*; RAI Manual at G-5. The amount of support figure is a number between 0 and 3, with 0 indicating that "no setup or support from staff" is required for the resident to perform the activity, and 3 indicating that physical assistance from two or more nursing staff is needed. Ex. 1 § G; RAI Manual at G-5 to -6.

118. The self-performance and support-provided figures are combined to generate a score of 0 to 4 for each of the four key types of activity, and the sum of those scores is the resident's combined ADL score. *See* RAI Manual at 6-18.

119. A higher combined ADL score is supposed to reflect the fact that the resident requires more attention from nursing staff, and thus results in a RUG level corresponding to a higher *per diem* rate of reimbursement. Table 1 illustrates the connection between combined ADL scores and *per diem* rates

120. Relator estimates that 90% of the ADL scores in RUG levels billed to the federal government were upcoded. Very few residents were coded as RUX, with "X" representing the highest ADL code. However, the vast majority of residents were coded as RUC, with the "C" representing a mostly-dependent resident. In reality the residents typically would be more able than their ADL score would suggest.

121. For example, a Medicare-covered resident would be coded in Section G of his 5-day MDS Assessment as needing extensive assistance (self-performance score of 3) and the support of one or two nursing staff members (support provided score of 2 or 3) to get in and out of bed, use the toilet, and move from place to place in his room. The resident would be coded as totally dependent (self-performance score of 4) and requiring the assistance of two nursing staff (support provided score of 3) to stand or move from a chair to another location and to perform personal hygiene (*i.e.*, combing hair, *etc.*). Such coding would yield an ADL score of 12.

Combining this ADL score with therapy minutes and other services that a resident received, a resident would be assigned a RUG level of, *e.g.*, RUC, RVC, or RHC (all of which require an ADL score of at least 11). A RUG level of RUC was typical.

122. However, Relator observed that such coding in Section G of a resident's MDS Assessment frequently had no relation to – and indeed was completely contradicted by – the resident's actual medical records. One type of record kept in a resident's medical file or "chart" is an ADL & Nutrition/Hydration Care Record, commonly referred to as an ADL chart. This is a one-page chart typically completed by certified nurse assistants ("CNAs") recording, for each shift and each day of the month, the resident's self-performance and the amount of assistance they provided to the resident. Relator would typically review these charts in the course of completing a resident's MDS Assessment. Even for some residents with an ADL score of 11 or higher, Relator noticed that CNAs would consistently report on those residents' ADL monthly charts that they were fully independent and required no assistance to get in and out of bed, transfer between surfaces, and use the toilet.

123. For example, for one Resident #1 who was present in the facility on October 16, 2013, the MDS assessment stated that the Resident had walked in the corridor with staff assistance. The coding was outrageously inaccurate because Resident #1 ***had no legs*** and could not walk even with assistance. This falsehood was also material, as it increased the resident's ADL scores, resulting in higher RUG levels and higher levels of reimbursement.

124. When Relator "corrected" the ADL score for that resident when compiling the MDS to be submitted to Medicare in support of a claim, Dana Thompson challenged Relator. In a meeting between the two on October 16, 2013, Thompson told Relator to change the MDS back to the original artificially-high score.

125. Ultimately, the conflict between Relator and Thompson was escalated to the Facility Administrator, Tom Davis. Davis met with Relator on November 18 and 20, 2013, and put Relator on probation for correcting the medical records and MDS to show the actual level of resident dependency. Relator appealed to Thompson about being disciplined for trying to do the right thing, and Thompson told her words to the effect that her job was to follow orders and submit the MDS assessments.

## L. Falsification of Medical Records to Increase ADL Scores

126. Relator also observed that residents who were billed as "extensive services," for example, respiratory support, were not receiving those services. With respect to "Resident X" Relator copied the Nebulizer Treatment Flowsheet to document this:



127. Weeks later, when Relator came to review the Nebulizer Treatment Flowsheet, she found that the record had been "backfilled" to suggest that the services had been provided when they had not, and that the chart entries had been completed contemporaneously when they had not:

128. Relator again came into conflict with Thompson over "Resident Y" who was supposed to be receiving oxygen through a nasal tube, however the oxygen was not being provided and again the chart reflect this non-provision. Relator brought this to the attention of Heather Ratliff, the Director Nursing, and explained that Resident Y was not receiving oxygen. When Relator came to review the records two weeks later to complete the MDS assessment, she found that the record had been backfilled.

129. These are specific examples of the common practice of fraudulently increasing the ADL scores reported in Section G of the MDS Assessment. *See* Ex. 1 § G, at 14-15. Based on Defendants' policies and practices witnessed by Relator, she alleges that RUGs were inflated in Defendants' facilities across the country based on the instruction and directives of Defendants' management, including the National Reimbursement Coordinator, Melissa Green.

**INFLATED COST REPORTS TO MEDICARE AND MEDICAID**

130. When Defendants took over the 21 Kentucky SNFs from Extendicare, they absorbed each of the new facilities into their corporate structure using their corporate business model. Just like all the other facilities owned and operated by Defendants, Stanton was required to execute a Management Agreement with a captive regional management company. In the case of Stanton, a Kentucky facility, the regional management company was Defendant Kentucky Partners Management, LLC ("KPM"). The agreement was signed on July 1, 2012, by Defendant

Scott, in his capacity as "manager" of Stanton, and by Gary Anderson, in his capacity as "manager" of KPM.

131. The Stanton-KPM agreement provides that, in return for five percent (5%) of Stanton's adjusted gross revenue, KPM contracts to manage virtually every aspect of Stanton's business. The only exception under the contract is that Stanton retains the ownership of all licenses and permits and is afforded the privilege of being able to visit and inspect the Stanton facility.

132. Then, by a second agreement executed at the same time, between KPM and Defendant Preferred Care Partners Management Group, LP ("PCPMG"), KPM concedes that, notwithstanding its management agreement with Stanton, KPM does "not have any personnel or facilities to provide such services." So, under the KPM-PCPMG agreement, KPM contracts with PCPMG to undertake all of its management obligations for Stanton and others in return for $360,000 per month.

133. Under its contract, the regional management company KPM receives 5% of its regional facilities' income for its ***illusory*** management services – an annual fee equal to roughly $6.75 million.[2] Under its contract with KPM, PCPMG receives an annual fee of $4,320,000 for undertaking all the same responsibilities. Somewhere between the pages of the two contracts $2,550,000 is skimmed in the transaction *per annum*.

134. This model is replicated for each of Defendants' SNF regions resulting in a nationwide "skim" of approximately $13,000,000 (given that Kentucky is home to roughly 20% of Preferred Care's facilities in the United States). This $13,000,000 represents the massive extent to which all cost reports for Defendants' facilities are inflated on an annual basis.

---

[2] Based on 2011 figures for the Kentucky facilities.

## DAMAGES TO MEDICARE, TRICARE AND MEDICAID

135. The fraudulent practices detailed in this Complaint, including but not limited to the specific residents detailed above, have resulted in tens if not hundreds of millions of dollars in false claims being submitted to, and paid by, the United States government and the governments of the Named States – and Defendants have been unjustly enriched as a result. In 2012, Defendants did not rank in the largest 50 providers of skilled nursing care in the United States. In 2013, Defendants entered the top 50 in tenth place with 10,587 beds and a reported income of $602 million per year. According to the current *LinkedIn* profile of Logan Sexton, Defendants' new Chief Operating Officer, Defendants now operate 11,500 beds and generate annual income of $750 million.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

136. Relator and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

137. Defendants presented, or caused to be presented, false or fraudulent claims to CMS and its agents, other government health programs, and MA Plans.

138. Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

139. The United States, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

140. Accordingly, Defendants are liable for treble damages, civil penalties, attorneys' fees, and the costs of this action under 31 U.S.C. § 3729(a)(1)(A).

141. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the United States as a result of this claim.

## COUNT II

### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

142. Relator and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

143. Defendants made, used, or caused to be made or used false or fraudulent records or statements, including MDS Assessments and resident records containing such MDS Assessments and other falsified information, as alleged above.

144. These false records or statements were material to false or fraudulent claims made to CMS and its agents, other government healthcare programs, and MA Plans.

145. Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

146. The United States, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

147. Accordingly, Defendants are liable for treble damages, civil penalties, attorneys' fees, and the costs of this action under 31 U.S.C. § 3729(a)(1)(B).

148. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the United States as a result of this claim.

## COUNT III

### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

149. Relator and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

150. Defendants made, used, or caused to be made or used false or fraudulent records or statements, including MDS Assessments and other falsified information, as alleged above.

151. These false records or statements were material to Defendants' obligation to pay or transmit money or property to CMS, its agents, and other government healthcare programs – including Defendants' obligation to repay money or property they had previously improperly received from CMS, its agents, or other government healthcare programs.

152. Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

153. Defendants concealed or improperly avoided their obligation to pay or transmit money or property to CMS and its agents.

154. Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided their obligation to pay or transmit money or property to CMS, its agents, or other government healthcare programs.

155. The United States, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

156. Accordingly, Defendants are liable for treble damages, civil penalties, attorneys' fees, and the costs of this action under 31 U.S.C. § 3729(a)(1)(G).

157. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the United States as a result of this claim.

**COUNT IV**

Connecticut False Claims Act, Connecticut General Statutes § 17b-301a, *et seq.*

158. Relator repeats and re-alleges the allegations and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

159. By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a Connecticut agency a false claim for payment or approval in violation of Conn. Gen. Stat. § 17b-301b(a)(1).

160. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Connecticut agency in violation of Conn. Gen. Stat. § 17b-301b(a)(2).

161. Connecticut, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

162. By reason of Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

163. Pursuant to Conn. Gen. Stat. § 17b-301b(a), the State of Connecticut is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or

fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

164. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the State of Connecticut as a result of this claim.

**COUNT V**

Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*

165. Relator repeats and re-alleges the allegations and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

166. By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a Florida agency a false claim for payment or approval in violation of Fla. Stat. § 68.082(2)(a).

167. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Florida agency in violation of Fla. Stat. § 68.082(2)(b).

168. Florida, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

169. By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

170. Pursuant to Fla. Stat. § 68.082(2)(g), the State of Florida is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent

claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

171. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the State of Florida as a result of this claim.

**COUNT VI**

Iowa Medicaid False Claims Act, Iowa Code § 685, *et seq.*

172. Relator repeats and re-alleges the allegations and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

173. By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a Iowa agency a false claim for payment or approval in violation of Iowa Code §685.2.1.a.

174. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Iowa agency in violation of Iowa Code §685.2.1.b.

175. Iowa, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

176. By reason of Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

177. Pursuant to Iowa Code § 685.2.1, the State of Iowa is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

178. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the State of Iowa as a result of this claim.

**COUNT VII**

Louisiana Medical Assistance Programs Integrity Law, Rev. Stat. Ch. 3 § 437.1, *et seq.*

179. Relator repeats and re-alleges the allegations and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

180. By virtue of the acts described above, Defendants knowingly presented or caused to be presented to Louisiana false or fraudulent claims in violation of 46 La. Rev. Stat. Ch. 3 § 438.3(A).

181. By virtue of the acts described above, Defendants knowingly engaged in misrepresentation to obtain, or attempt to obtain, payment from Louisiana medical assistance programs funds in violation of 46 La. Rev. Stat. Ch. 3 § 438.3(B).

182. Louisiana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

183. By reason of Defendants' acts, the State of Louisiana has been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

184. Pursuant to 46 La. Rev. Stat. Ch. 3 § 438.5 and § 438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

185. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the State of Louisiana as a result of this claim.

**COUNT VIII**

Maryland False Health Claims Act, Md. Code Ann., Health-Gen § 2-601, *et seq.*

186. Relator repeats and re-alleges the allegations and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

187. By virtue of the acts described above, Defendants knowingly presented or caused to be presented to an officer or employee of a Maryland agency a false claim for payment or approval in violation of Md. Code Ann., Health-Gen § 2-602(a)(1).

188. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by a Maryland agency in violation of Md. Code Ann., Health-Gen § 2-602(a)(2).

189. Maryland, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

190. By reason of Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

191. Pursuant to Md. Code Ann., Health-Gen § 2-602(b), the State of Maryland is entitled to three times actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

192. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the State of Maryland as a result of this claim.

## COUNT IX

Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010, *et seq.*

193. Relator repeats and realleges the allegations set forth in paragraphs 1 through 181 as if fully set forth herein.

194. This is a claim for treble damages and penalties against Defendants under the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010, *et seq.*

195. By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Nevada in violation of Nevada law.

196. By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to induce the State of Nevada to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of Nevada law.

197. The State of Nevada – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendants – paid and continues to pay claims that would not be paid but for Defendants' conduct as alleged herein.

198. By reason of Defendants' conduct, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

199. Pursuant to Nevada law, the State of Nevada is entitled to three times the amount of actual damages, plus the maximum penalty of $10,000, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendants, as alleged herein.

200. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. And, as provided by Nevada law, Relator is entitled to a "relator's share" of any recovery obtained by the State of Nevada (and/or the federal government) as a result of this claim.

## COUNT X

New Mexico False Claims Act, N.M.S.A. § 27-14-1, *et seq.*

201. Relator repeats and re-alleges the allegations and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

202. By virtue of the acts described above, Defendants presented, or caused to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent in violation of N.M.S.A. § 27-14-4(A).

203. By virtue of the acts described above, Defendants made, used or caused to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false in violation of N.M.S.A. § 27-14-4(C).

204. New Mexico, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

205. By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

206. Pursuant to N.M.S.A. § 27-14-4, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty which may be applicable for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

207. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the State of New Mexico as a result of this claim.

**COUNT XI**

Oklahoma Medicaid False Claims Act, Okla. Stat. § 63-5053, *et seq.*

208. Relator repeats and re-alleges the allegations and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

209. By virtue of the acts described above, Defendants knowingly presented or caused to be presented to Officers or employees of the State of Oklahoma a false claim for payment or approval in violation of Okla. Stat. § 63-5053.1B1.

210. By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, a false record or statement to obtain payment or approval by Oklahoma of a false claim in violation of Okla. Stat. § 63-5053.1B2.

211. Oklahoma, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

212. By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

213. Pursuant to Okla. Stat. § 63-5053.1B, the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

214. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the State of Oklahoma as a result of this claim.

**COUNT XII**

Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001, *et seq.*

215. Relator repeats and re-alleges the allegations and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

216. By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the State of Texas for payment or approval in violation of Tex. Hum. Res. Code § 36.002.

217. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce Texas to approve and pay such false and fraudulent claims in violation of Tex. Hum. Res. Code § 36.002.

218. Texas, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

219. By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

220. Pursuant to, in violation of Tex. Hum. Res. Code § 36.052, the State of Texas is entitled to two times the amount of actual damages plus the maximum penalty of $15,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

221. In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. Relator is entitled to a "relator's share" of any recovery obtained by the State of Texas as a result of this claim.

**CLAIMS FOR RELIEF**

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America and the Named States and on her own behalf, demands and prays that judgment be entered as follows against the Defendants:

(a) In favor of the United States against the Defendants for treble the amount of damages to Medicare, Medicaid, TRICARE and other government payors from the Defendants' unlawful activities, plus maximum civil penalties as provided by law for each violation of the federal False Claims Act;

(b) In favor of the United States against the Defendants for disgorgement of the profits unlawfully obtained by Defendants as a result of their unlawful conduct as alleged herein;

(c) In favor of the Relator for the maximum amount of Relator's Share allowed pursuant to 31 U.S.C. § 3730(d), plus reasonable expenses, attorneys' fees and costs incurred by Relator;

(d) In favor of the Relator and the Named States against Defendants in an amount equal to three times the amount of damages to the Named States from Defendants' unlawful conduct, plus maximum civil penalties as provided by law for each violation of the False Claims Acts of the Named States;

(e) In favor of the Relator for the maximum amount of Relator's Share allowed pursuant to the Named States' False Claims Acts, plus reasonable expenses, attorneys' fees and costs incurred by Relator; and

(f) Such other relief as this Court deems just and appropriate.

PLAINTIFF-RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS

Respectfully submitted

Dated: December 27th, 2016

[signature]

Elliott C. Miller, Esq.
Thomas W. Miller, Esq.
Don A. Pisacano, Esq.
Elizabeth C. Woodford, Esq.
MILLER, GRIFFIN & MARKS, PSC
271 W. Short Street, Suite 600
Lexington, Kentucky 40507
Telephone: (859) 255-6676
Facsimile: (859) 259-1562
*emiller@kentuckylaw.com*
*twm@kentuckylaw.com*
*pisacano@kentuckylaw.com*
*ewoodford@kentuckylaw.com*

and

Royston H. Delaney, Esq.
Charles F. Kester, Esq.
Ilyas J. Rona, Esq.
DELANEY KESTER LLP
745 Atlantic Avenue
Boston, Massachusetts 02111
(857) 498-0384
*royston@delaneykester.com*
*charles@delaneykester.com*
*ilyas@delaneykester.com*

Attorneys for Plaintiff-Relator